May it please the court, my name is Dennis Smuchnicki and I represent Ms. Mengistu in this case. I'd like to reserve two minutes for rebuttal. Okay, we'll try to help you, but you keep track of the time. The clock goes down. Essentially, the case below involves two somewhat unique aspects of the question of whether she was a refugee and whether Ms. Mengistu suffered past persecution. The immigration judge, and that was basically adopted per curiam by the BIA, seemed to reason that because Ms. Mengistu was driven from Ethiopia during the Ethiopian-Eritrean war, that she was a war refugee. And as was set forth in the briefs, and I think it's very clear, that that conclusion is extremely inconsistent with this court's previous decision in the Ndome case. Where this court in Ndome said that the mere fact that there's a war going on doesn't create persecution, which is the basic law. However, this court specifically said where the civil strife has its root in an enmity based on a protected category, then there can be persecution. And that's exactly what we have in this case, where Ms. Mengistu was essentially labeled as being Eritrean origin, and therefore she Since time is so short, it seemed to me that you were a little bit inconsistent in your brief. You argued against remand on the question of a well-founded fear of persecution. But then later in the brief, it was based on the case of Babala. But in your reply brief, you seemed to have conceded that remand is appropriate. Would you clarify your position on this? Okay. Well, I did not write the brief. That was written by other counsel. But I think the point is that I think past persecution, we believe past persecution has been established. But remand may be appropriate on the second aspect of this argument, which is whether or not the denaturalization and expulsion constituted persecution. And we think that the case law establishes that it does, but neither the judge nor the BIA specifically addressed that point. And therefore, I believe under Venturi, it might be appropriate that that should be remanded to the BIA solely for that issue to address, whether or not the stripping her of her citizenship and expelling her from Ethiopia constituted persecution. I see that. Are there any cases on that particular issue? And then, excuse me, Judge Fletcher. Yes. In the briefs, there are a couple of cases from the Seventh Circuit, Haley versus, I think it's Ashcroft or Gonzalo, but the Haley case from the Seventh Circuit and then a follow-up case, another Ethiopian case from the Seventh Circuit. Both suggest that it is persecution. And in those cases, they do remand to the BIA to address that issue. And then there's no subsequent reported decision. But we have no Ninth Circuit cases. No. Thank you. This is just a follow-up on Judge Nelson's question. That helps me a lot. So you rely on the DOM only for the proposition that the fact that it's wartime doesn't make the claim disappear. It can be there in wartime. But the question is whether or not exile, if that's the right word, coerced exile is itself persecution that you want us to send back so that we can get a decision out of the BIA. Well, we'd prefer that you address it. But I think under Ventura, that that's probably a proper course. I mean, I read the Seventh Circuit Haley case. Judge Rovner says, well, arguably. And then she says, but we don't know. We don't have anything out of them and send it back. And there's no published decisions from the BIA since that time. And it's not addressed in this case. So probably, to me, I think what should be done here is to recognize that under the DOM, the civil existence of the war did not preclude the claim of persecution. And, therefore, it must be remanded back to address the issue of whether the denationalization and expulsion, the combination of the two, in this case constitutes persecution, particularly in light of the fact that she was basically driven into Sudan, which is not exactly a resort, to put it mildly. Did you address the resettlement issue that the IJ? Yes, Your Honor. I think the manner in which the IJ approached the resettlement issue really is inconsistent with some subsequent decisions that have come out of this court. I think Maharaj, I think in 2006, which was an en banc decision, said that the burden is on the government to establish an offer of resettlement and that it's only when the government meets its burden that it shifts. And in this case, the government didn't establish anything that remotely approaches an offer from the Sudanese government to these refugees in this refugee camp in the middle of nowhere that they were allowed to stay. So your position is that Chio has been overruled by Maharaj? Did we actually say that in Maharaj? No, I think that you have – I would say that Maharaj emphasizes the regulation and emphasizes that you have to follow the firm resettlement regulation, which focuses on an offer of settlement. And I think in Maharaj you said that the first thing to look at is the action of the government in that country. Now, in that other – I'm a little confused by your argument, because we did say – I'm looking at Chio 162F3, 1229. We talk about the regulation and that – regarding resettlement, and where three years of residence had been established, we said that that essentially raised, I guess you'd call it a prima facie case of resettlement, sufficient to shift the burden based on the inference from the duration of the stay to the petitioner to disprove resettlement. And my question for you is if that's still good law, what evidence did Ms. Mings do offer to disprove the inference? Well, number one, that was three years. This is two. So that's a year less. In fact, I believe this is 18 months, so it's basically half that time. Twenty, isn't it? Twenty. But that's a significant amount of time. It's almost – it's a year less. So that – Assume that 20 months is a significant amount of time. So without regard to arguing 20 months versus 36 months, what evidence did she offer to rebut the inference? Well, again, I would argue there's no inference to rebut because she – Is your answer there is no evidence, counsel? You're dancing around my question. The evidence that we have is simply that she had no rights to anything. She was simply sitting in a refugee camp. It's probably closer to the Composeco Monteo case that was cited in our brief where you're in a refugee camp, you don't have any rights – there's nothing established you have rights to go around the city or around the country to do anything. She's sitting unemployed in a refugee camp. Are you arguing or are you telling me what the record shows? Because I didn't find much in the way of testimony as to what the conditions were either in the refugee camp or what she did during the 20-month period that she lived there. I agree. The record is sparse. And I think that also gets back into – then I would have to say we'd have to look at a little bit more about the way Maharaj approaches this. Because, for example, to just say, well, she's been there three years, that creates a presumption. I think really lets the government office off the burden. Because the government could produce a report from the State Department or something like that that says the fact of the matter is in Sudan. They are allowing people to stay. Those are resources within the government's possession. And the government really presented absolutely nothing. And to say that, well, just the mere passage of time alone is sufficient, I think that's not accurate. And it's inconsistent with the regulations. What would it have been for her to simply testify to what the conditions were in the refugee camp? That all we did was sit around and go to the soup line three times a day, and we couldn't get any work because there were no jobs. The government of Sudan wouldn't – you could do it with 12 questions. I think you probably could, but I wasn't the trial attorney. If I'm the trial attorney, I'm not even sure that I see that there's a firm resettlement issue on this record of two years. The government had an opportunity, for example, at the hearing to introduce a document from the State Department with an opinion letter saying that we believe that the government of Sudan is granting sanctuary. And then they would have been put on notice to rebut it, but they didn't have any even notice of that issue. And I think that's one of the reasons the record is sparse. Counsel, may I intercede here? When I looked at the record, the AR-155, Meng Su specifically testified that she had never received an offer of citizenship or permanent resident in Sudan. So doesn't that leave the burden with the government? Yes. She said that she – there was no indication that she could stay there. Yes. Then what didn't the burden go under as I read Composeco finding that Petitioner had not firmly resettled in Mexico despite living there for 16 years because he did not receive a permanent residence visa and his movements were restricted by being in the camp. All right. You sum up my point exactly, Your Honor. Okay. Well, excuse me. We have taken you to the full extent of your time. You wanted to save a little time. Let's hear from the government, but we'll make sure you get a chance to respond. May it please this Court, my name is Andrew Oliveira. On behalf of the Respondent, the Attorney General Eric H. Holder. The first issue in this case is whether or not Meng Tzu was able to establish that she was persecuted on account of a protected ground. Petitioner claims that the fact that she was expatriated necessarily establishes that fact. However, the immigration judge – I think I heard the opposite. I think I heard that they want a remand to the IJ and the BIA so they can argue the question. Okay. Well, with respect, though, asylum cases do not – are not established on a per se basis. They are established on a case-by-case where the immigration judge weighs the facts of each individual case. And the immigration judge, looking at the facts of this case, found that Petitioner failed to establish that the mistreatment she suffered rose to the level of persecution. The evidence in the record does not compel reversal of that finding. Let me go step-by-step then. Part of the reasoning of the IJ was this is wartime and we treat things that happen in wartime somewhat differently. With respect, Your Honor, I don't think that's exactly what he held. I think he noted that there's a difference that a person fleeing a country due to civil strife or war does not per se establish eligibility for asylum. Correct. They must show that they were harmed on account of. So simply demonstrating that they're a war refugee does not create per se eligibility or per se ineligibility. Fair enough, sure. So then he then looked at the factors that she presented and determined that they did not rise to the level of persecution. Notably – Counsel, then I have a question about that. It's a legal question. It is starting with the first novice prong. It says it acts rising to the level of persecution. Now, in light of the norms of international law and the Supreme Court's holding in trope, how can we find that stripping someone of citizenship or expelling them does not amount to persecution? Well, with respect, Your Honor, the facts of the record do not establish that she was stripped of her citizenship or that she was forcibly expelled. The facts demonstrate – She was denationalized. I mean, what do you mean she wasn't stripped of her citizenship? There was no proceeding where she was stripped of her citizenship. When the officials came to her employer's place of business, they spoke only to the employer. The employer stated to her that they should leave. She voluntarily followed him and picked up the exit. Voluntarily is an interesting word in that context. Well, the petitioner claims that she was coerced and that she had no other option. However, the record doesn't establish that she was threatened with deportation or that there were consequences for not leaving. EIJ himself uses the word coercion as to what happened to her. He discusses that, but it's important to note that her family remained in Ethiopia, and there's no evidence that they suffered any harm. So it does not follow that she would have been harmed had she not voluntarily left. There's simply nothing. Now, the word voluntary is a tricky word. If you hold a gun to my head and say, sit down, and I then sit down, in some sense I have acted voluntarily. That may be the sense in which you're using the term. No. With respect to the fact, had they put a gun to her head and said, you need to go, you need to leave, that would be different. But there was no threat of deportation. There was no threat of harm. The record reflects that the police officers spoke to her employer, and her employer said that they should leave. She was not threatened with harm. She was not threatened with deportation. Furthermore. But, counsel, in this case, the Ethiopian government solely targeted Eritreans based on their ethnic status. Why isn't there a nexus between that and what happened to her in this case? The immigration judge only focused on whether the harm rose to the level of persecution. There really wasn't a discussion as to whether it was on account of protected ground. I don't think that's actually an issue in this case, whether or not it was on account of her ethnicity. I quite disagree with that. Because she fled because the government told all Eritrean people to leave. Is that not so? No. Well, with respect to. Did the government tell all Eritrean people to leave? Well, with respect, though, not all Eritreans left and there was no harm. After all. That's not the question. Not whether all left. The question is whether the government told all to leave. There was nothing in the record that firmly established that there was an order that all Eritreans be removed. The question is, in this case, whether she was ordered deported. And that is simply not the case. Again, her family stayed. They didn't suffer any harm. She was never formally threatened or deported. Again, there's no evidence that she could not return to Ethiopia. Well, let's talk about that. AR-343 is some document that was issued by or purports to be from the Ethiopian Security Administration and Refugee Affairs Authority, and there was testimony about this stamp in the lower left-hand corner that apparently indicates she can't return to Ethiopia. Do you quarrel with the IJ's finding that that's what that stamp says? The immigration judge made a number of notable points about that. One, there was no forensic examination of that document to determine whether or not it was valid. The immigration judge accepted it solely for the fact that it allowed her to leave and enter Sudan. He did suggest that it stated that it was not for reentry. But as we note, it does not bear language that the person was expelled, never to return, or anything of that nature. It should be also noted that Dishon never, once she arrived in the United States, applied for readmission to Ethiopia. There's nothing in the record that establishes that she is prohibited from returning. And I think that's important, that nothing in the evidence compels reversal of the immigration judge's findings. So the only evidence of record is her testimony that that's what she understands from this document, which you say the IJ did not find to be authentic? It's not that he found it to be unauthentic. He simply found that because there was no forensics, he couldn't accept it at face value. Doesn't forensics mean, I don't know whether this is a legitimate document or not, it hasn't been examined forensically to determine its authenticity? Correct. And so it was accepted for the fact that she could exit and then enter, exit Ethiopia and enter Sudan. But whether to the fact that it establishes that she is unable to return to Ethiopia, it does not do so. Again, the evidence in the record simply does not compel reversal. Could you address the firm resettlement point, please? Respectfully, firm resettlement only needs to be addressed if there's been a finding of a well-founded fair future person. I understand that. As this Court has held, a lengthy undisturbed residence in a third country creates a presumption of firm resettlement. How about a 20-month stay in a refugee camp in Sudan? I don't think that the specific time, if it's 18 months, it is not, and if it's 20, it is. It's a general finding of fact by the immigration judge. Here, just because she did not receive an offer of citizenship doesn't mean that she couldn't receive it. She didn't apply for status. She didn't apply for a bank account or anything else. Again, as Judge Talen pointed out, there's simply no evidence as to what life was like in this refugee camp. Therefore, it's not comparable to Compenseco Montejo, where the ailing in that case demonstrated that there were significant restrictions on liberty, there were repeated threats of repatriation. That simply is not in the evidence here. So to the extent that they claim that the presumption was rebutted, the evidence does not compel reversal. Again, as this Court has held, though, it's the lengthy undisturbed residence creates the presumption. So she has the burden of establishing that she was not firmly resettled, and she failed to do so. If there are no further questions, the government submits on its brief. Okay. Any further questions from the judge? Okay. Thank you very much. Would you like a minute for response? On the issue about the effect of her banishment, a couple of points. Number one, there is evidence in the record, and I believe it's a Human Rights Watch report and also a U.N. report that all confirm that these banishment orders were issued and that essentially it read exactly the way hers did, and they were not allowed to come back in. So I think it's well established that testimony has to be interpreted in light of country conditions, and the country conditions in Ethiopia where they were banishing everybody. I mean, it's not even in dispute. The U.N. even had to get involved to put a halt to it. So this was a common practice, and when you look at the fact that she, her husband, was swept off the street and just taken away militarily. This happened before the government came to her employer. Yes. So this was in her head. Exactly. The government shows up to the employer and says, get rid of your Eritreans. And what's in her head is confirmed by independent documentation of the U.N. Human Rights Watch. So, I mean, this was not an invitation. I mean, say, you know, a question at the point of a gun is an order. I would summarize our position on that point. Thank you. Thank both of you for a helpful argument. The case of Mengstu v. Mukasey, or now Holder, submitted for decision.
judges: Nelson, Fletcher, Tallman